# EXHIBIT A

**Complaint**

Electronically Filed
4/1/2019 3:26 PM
Fourth Judicial District, Ada County
Phil McGrane, Clerk of the Court
By: Rose Wright, Deputy Clerk

Raymond D. Powers
ISB # 2737; rdp@powerstolman.com
Portia L. Rauer
ISB # 7233; plr@powerstolman.com
POWERS FARLEY, PC
702 West Idaho Street, Suite 700
Boise, ID 83702
Post Office Box 9756
Boise, ID 83707
Telephone: (208) 577-5100
Facsimile: (208) 577-5101
W:\3\3-065\Pleadings\Complaint and Demand for Jury Trial

Attorneys for Plaintiff

## IN THE DISTRICT COURT OF THE FOURTH JUDICIAL DISTRICT OF THE

## STATE OF IDAHO, IN AND FOR THE COUNTY OF ADA

| | |
|---|---|
| WENDY S. HOOD, individually and as surviving spouse of Jacob A. Neufeld and as the Personal Representative of the Estate of Jacob A. Neufeld,<br><br>     Plaintiff,<br><br>vs.<br><br>KATHRYN D. BEATTIE, M.D., an individual; KURT SEPPI, M.D., an individual; ST. LUKE'S HEALTH SYSTEM, LTD., an Idaho Corporation; ST. LUKE'S CHILDREN'S HOSPITAL, an Idaho Corporation; ST. LUKE'S REGIONAL MEDICAL CENTER, LTD., an Idaho hospital Corporation; PINE GROVE BEHAVIORAL HEALTH AND ADDICTION SERVICES; FORREST GENERAL HEALTH SERVICES, INC., a Mississippi Corporation, d/b/a Pine Grove Behavioral Health & Addiction Services; SOUTHWORTH ASSOCIATES, an Idaho Company,<br><br>     Defendants. | Case No. CV01-19-05768<br>_____<br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL** |

COMES NOW, Plaintiff Wendy S. Hood ("Plaintiff"), individually and as surviving spouse of Jacob A. Neufeld ("Dr. Neufeld"), deceased, by and through her attorneys of record, Powers Tolman Farley, PLLC, and complains and alleges against Defendants Kathryn Beattie, Kurt Seppi, St. Luke's Health System Ltd., St. Luke's Children's Hospital, St. Luke's Regional Medical Center, Ltd., Pine Grove Behavioral Health and Addiction Services, Forrest General Health Services, Inc., and Southworth Associates, LLC, as follows:

**PARTIES**

1.     At all times relevant to this matter, Plaintiff and Dr. Neufeld were a married couple residing in Ada County, Idaho.

2.     Dr. Kathryn Beattie is the Medical Director and Administrator of St. Luke's Children's Hospital.  Dr. Beattie was the department chair of the Pediatrics Department at St. Luke's and was Dr. Neufeld's immediate supervisor during the events detailed below. On information and belief, Dr. Beattie is a resident of Ada County, Idaho.

3.     Dr. Kurt Seppi is the Vice President and Executive Medical Director of St. Luke's Health Care System who, on information and belief, was a supervisor of Dr. Neufeld and coordinated with Dr. Beattie in all actions directed toward Dr. Neufeld as explained below.

4.     St. Luke's Health System, Ltd., St. Luke's Children Hospital, St. Luke's Regional Medical Center, Ltd. (collectively "St. Luke's") are Idaho non-profit corporations doing business in Idaho with their principal places of business in Ada County, Idaho.

5.     Pine Grove Behavioral Health and Addiction Services is an addiction recovery clinic owned and operated by Forrest General Health Services, Inc. (collectively "Pine Grove"). Pine Grove is located in Hattiesburg, Mississippi and conducts business throughout the United States, including Idaho, through its contact with hospitals located in Ada County, Idaho and its treatment of physicians from Ada County, Idaho.

**COMPLAINT AND DEMAND FOR JURY TRIAL - 2**

6.      Southworth Associates is an Idaho company specializing in addiction treatment and monitoring. Southworth Associates' (Southworth) principal place of business is located in Ada County, Idaho.

## JURISDICTION & VENUE

7.      Jurisdiction and venue are proper in this Court under Idaho Code §§ 1-705, 5-404, and 5-514. The amount in controversy exceeds the jurisdictional threshold of this Court.

## GENERAL ALLEGATIONS

8.      Plaintiff alleges and incorporates by reference all the allegations set forth in the paragraphs above.

9.      On or about March 31, 2013, St. Luke's hired Dr. Neufeld as a pediatric physiatrist. As a pediatric physiatrist, Dr. Neufeld held a rare cross-certification in pediatrics and physical medicine and rehabilitation and was triple-board certified. Since only a few hundred physicians in the United States hold such a certification, Dr. Neufeld's arrival at St. Luke's allowed St. Luke's to increase the pediatric health care services it could offer to its pediatric patients. Dr. Neufeld's employment was governed by a Physician Employment Agreement with an effective date of January 15, 2013 (the "Agreement").

10.     The Agreement provided that Dr. Neufeld would perform both medical services and administrative duties for St. Luke's, with Dr. Neufeld dedicating approximately 70% of his time to treating patients and the remaining time performing services as Medical Director of Pediatric Physiatry. Pursuant to the Agreement, Dr. Neufeld would receive an annual salary of $300,000.00 which compensated him for both his role as physician and administrator.

11.     As a medical director, Dr. Neufeld was responsible for the creation and growth of St. Luke's pediatric physiatry clinic which was created upon his arrival. Although Dr. Neufeld's unique qualifications allowed for the improved care of pediatric patients generally, his presence at

St. Luke's would prove particularly beneficial to children suffering from spinal cord and brain injuries.

12.     In addition to his regular clinic hours and responsibilities as a medical director, the Agreement required Dr. Neufeld to be on call every 1 out of 4 evenings and weekends. This call schedule was typical for most physicians at St. Luke's.

13.     Dr. Neufeld's hiring brought immediate benefits to both St. Luke's and its patients. Dr. Neufeld was uniquely qualified to treat debilitating injuries such as cerebral palsy, muscular dystrophy, and spina bifida.

14.     An example of Dr. Neufeld's unique qualifications was his ability to use a device called a Baclofen pump. A Baclofen pump is a device implanted into the spine of a patient suffering from a spinal cord injury that would intermittently administer Baclofen. Baclofen prevents or reduces spasticity, a common symptom of individuals suffering from spinal cord injuries. Baclofen pumps are complicated medical devices with a high error rate. Dr. Neufeld was uniquely qualified to install and program such pumps in children.

15.     At the time he was hired, another physician on the medical staff at St. Luke's was qualified to care for patients on Baclofen pumps and shared call responsibilities with Dr. Neufeld. Shortly after Dr. Neufeld's arrival at St. Luke's, the physician ended his relationship with St. Luke's, leaving Dr. Neufeld as the only qualified physician to care for pediatric patients with Baclofen pumps.  The result of which was that Dr. Neufeld was on call 24 hours a day, 7 days per week.

16.     Dr. Neufeld repeatedly expressed concern about the lack of medical staff to share call with him for pediatric patients with Baclofen pumps.  St. Luke's assured Dr. Neufeld it was bringing other physicians on board who were qualified to share call for pediatric patients with Baclofen pumps.

17.    Dr. Neufeld complied with his contractual obligations to St. Luke's. St. Luke's, however, failed to honor the promises made to Dr. Neufeld upon which the Agreement was founded. Despite the Agreement only requiring Dr. Neufeld to occasionally be on call, Dr. Neufeld was forced to take call 24 hours a day, 7 days a week.

18.    Dr. Neufeld repeatedly expressed his concern about being on call 24/7 and requested that St. Luke's take steps to correct the defective call coverage system. Dr. Neufeld's primary concern was that the defective call coverage system put patients at risk. Dr. Neufeld had repeated discussions with Dr. Kathryn Beattie, the Medical Director and Administrator of St. Luke's Children's Hospital, and Dr. Kurt Seppi, the Vice President and Executive Medical Director of St. Luke's Health System, but to no avail. St. Luke's and its administrators rejected Dr. Neufeld's request for assistance. St. Luke's knew correcting the call coverage system would require the hiring of additional qualified and expensive personnel, and this was an expense St. Luke's refused to incur.

19.    Dr. Neufeld continued to petition for improvements to the call coverage system while working tirelessly to care for his patients, build the pediatric rehabilitation practice at St. Luke's, and attend to his administrative duties. Unlike Dr. Neufeld, however, St. Luke's focus was not its patients, but on costs. Despite their non-profit label, St. Luke's considered itself first and foremost a business, to the detriment of its employees and patients. Ultimately, as Dr. Neufeld persisted in his claims that the call coverage was inadequate and put patients in jeopardy, St. Luke's became concerned that Dr. Neufeld's claims would expose St. Luke's to increased liability and added expense. Rather than accepting those responsibilities, St. Luke's attempted to silence Dr. Neufeld.

20.    In September 2016, St. Luke's took punitive action against Dr. Neufeld and modified the original Agreement to significantly reduce his salary while simultaneously increasing his work hours. Dr. Neufeld accepted the new terms for the purpose of remaining with his patients

and operating the clinic. To balance the terms of the modification, the modified Agreement purported to relieve Dr. Neufeld of his on-call duties, which St. Luke's claimed made Dr. Neufeld's salary reduction fair and reasonable. St. Luke's knew, however, that it lacked qualified physicians to cover Dr. Neufeld's patients and the clinic, and further, that Dr. Neufeld would not allow his patients to receive inadequate and sub-standard care. As a result, Dr. Neufeld continued to be on call every evening and weekend to ensure his patients received proper care. Dr. Neufeld was a professional and caring physician, characteristics St. Luke's used to its financial advantage.

21.     The inevitable result of the defective call coverage system and the increase in clinic hours was that Dr. Neufeld began to experience fatigue and became depressed. Still, Dr. Neufeld continued to petition St. Luke's for corrections to its call coverage, warning of the current system's potential dangers.

22.     On or about April 16, 2017, an incident occurred where Dr. Neufeld allegedly made a miscalculation when programming a Baclofen pump. As noted above, errors when working with Baclofen pumps are common given their complexity. The miscalculation went unnoticed until that night when the patient returned to St. Luke's complaining of some spasticity. St. Luke's followed its typical protocol and attempted to call Dr. Neufeld after hours. St. Luke's was unable to reach Dr. Neufeld, however. With Dr. Neufeld unavailable, and with no other employee qualified to operate the pump, St. Luke's was forced to contact the Baclofen pump manufacturer to correct the miscalculation. The manufacturer was able to assist, and the patient returned home without injury.

23.     The pump incident was minor and was an example of St. Luke's constant reliance on Dr. Neufeld. After learning of the incident, Dr. Neufeld requested that the matter be peer reviewed to determine the source of the error, but St. Luke's refused. Instead, St. Luke's, tired of Dr. Neufeld voicing his concerns regarding the standard of care, acted punitively and without due process. St. Luke's retaliated against Dr. Neufeld and demanded he take a medical leave of absence to receive a medical evaluation. In an effort to justify these requests, St. Luke's fabricated

additional complaints against Dr. Neufeld by claiming Dr. Neufeld's work performance was generally poor, that he was unreliable, and acted unprofessionally. Dr. Neufeld was blindsided as St. Luke's had never mentioned these complaints.

24.     For his evaluation, St. Luke's required that Dr. Neufeld be evaluated by Southworth, a company that treats individuals with addictive behavior. St. Luke's demanded Dr. Neufeld be treated by Southworth knowing that Dr. Neufeld did not suffer from any addictive behavior. Dr. Neufeld submitted to St. Luke's demands only to preserve his employment.

25.     Dr. Neufeld knew the Agreement required him to submit to any reasonable medical examination requested by St. Luke's. If he refused, the Agreement allowed for his immediate termination. St. Luke's sought to exploit that provision. St. Luke's selection of Southworth, while knowing Dr. Neufeld did not suffer from addictive behavior, signaled St. Luke's actual intent: to harass Dr. Neufeld until he failed to adhere to the medical evaluation provision of the Agreement, thus allowing his termination, or alternatively, force his voluntary resignation. St. Luke's had resolved to terminate Dr. Neufeld's employment, and to avoid any further salary obligations; all because Dr. Neufeld voiced his concerns regarding patient safety.

26.     Despite the unreasonableness of St. Luke's demands, however, Dr. Neufeld complied. He began his mandatory medical leave on or about April 25, 2017 by completing necessary paperwork for a leave of absence pursuant to St. Luke's guidelines and the Family Medical Leave Act ("FMLA"). On that same day, Dr. Neufeld contacted Southworth to arrange his evaluation. After only a cursory discussion, partly through text messages, Southworth recommended Dr. Neufeld receive a week-long evaluation from Pine Grove in Hattiesburg, Mississippi. Like Southworth, Pine Grove provides specialized treatment for individuals suffering from addictive behavior. Southworth made this recommendation knowing Dr. Neufeld did not suffer from addictive behavior.

**COMPLAINT AND DEMAND FOR JURY TRIAL - 7**

27.    Dr. Neufeld initially resisted the evaluation, believing it unnecessary. In response, Southworth, St. Luke's, and Drs. Beattie and Seppi threatened Dr. Neufeld that if he refused to be evaluated, he would lose his employment and be reported to the Idaho Board of Medicine. Mentally strained from working three years without a call partner and fearing for his career, Dr. Neufeld submitted to the evaluation.

28.    Dr. Neufeld was evaluated from May 1, 2017 thru May 5, 2017 by physicians and therapists at Pine Grove, including Dr. Peter Kamp, a psychiatrist employed by Pine Grove. Upon his arrival, Dr. Neufeld requested the results of his evaluation be kept confidential, but Pine Grove refused. Pine Grove and Dr. Kamp claimed they were obligated to provide the results of their evaluation to Southworth. Dr. Neufeld remained adamant the evaluation be kept confidential as he did not trust Southworth and feared they would disclose the evaluation to individuals at St. Luke's whom he did not trust, namely Dr. Beattie and Dr. Seppi. Pine Grove still refused to perform the evaluation without Dr. Neufeld signing the consents for release to Southworth. Ultimately, fearing refusal of Pine Grove's demand would result in his termination from St. Luke's, Dr. Neufeld relented and allowed disclosure of the evaluation to Southworth.

29.    The evaluation report was completed by Dr. Kamp on or about May 18, 2017, and was subsequently issued to Southworth, who in turn relayed its contents to St. Luke's. The report cited the information used in Dr. Neufeld's evaluation, which included the collection of testimony from several of Dr. Neufeld's colleagues and supervisors. Most of the testimony cited in the report praised Dr. Neufeld's skill, affability, and genuine care for his patients. A former St. Luke's administrator opined that the April 16, 2017 Baclofen pump incident should have been peer reviewed to determine the precise source of the error.

30.    The report included statements from Dr. Kathryn Beattie that claimed Dr. Neufeld was absent-minded, unreliable, and often failed to recognize social cues. Dr. Beattie complained that Dr. Neufeld was prone to errors, but could only reference the April 16, 2017 Baclofen pump

**COMPLAINT AND DEMAND FOR JURY TRIAL - 8**

incident as an example. An incident that was never peer reviewed. Dr. Beattie's criticisms were an outlier, however, as the remaining testimony cited in the report contradicted her claims.

31.     Pine Grove ignored the weight of the evidence and based their recommendations entirely on the statements of Dr. Beattie. Using Dr. Beattie's trivial complaints, Pine Grove declared Dr. Neufeld unfit to practice medicine and recommended he receive a six-week hospitalization at Pine Grove's facility in Mississippi. Pine Grove and Dr. Kamp's decision to ignore the weight of the evidence and choice to rely only on the claims of Dr. Beattie was objectively unreasonable; recommending a six-week hospitalization based on Dr. Beattie's trivial claims of questionable work performance was objectively outrageous. This conclusion is only cemented by the fact the evaluation confirmed, again, that Dr. Neufeld did not suffer from addictive behavior, even though Pine Grove is an addiction rehabilitation center.

32.     In sum, Pine Grove's evaluation did not reflect an objective medical opinion, but was a willful collusion with St. Luke's through Southworth and Drs. Beattie and Seppi to fabricate an evaluation to be used in St. Luke's harassment of Dr. Neufeld. This reality is reinforced by the lack of material discussion and recommendations regarding Dr. Neufeld's actual conditions, i.e. fatigue and depression. Instead, the evaluation recommended treatment that would worsen those conditions.

33.     After the evaluation report was issued, both St. Luke's and Southworth informed Dr. Neufeld his hospitalization was essential to keeping his job, and any refusal would result in his termination. Based on those threats, Dr. Neufeld reluctantly traveled to Mississippi for a six-week hospitalization. He arrived at Pine Grove on May 31, 2017, and was not released until August 10, 2017.

34.     According to Pine Grove medical records, after Dr. Neufeld's arrival he received minimal attention from Pine Grove medical staff, a clear indicator his hospitalization was unnecessary. Dr. Neufeld's treatment amounted to a few group sessions a week and analysis of the

medications he was taking. All treatments typically and easily performed in an outpatient setting. Neglected, Dr. Neufeld spent most of his time idle, waiting for his release. Pine Grove ostensibly became his prison.

35.     On one occasion Dr. Neufeld became overwhelmed by his confinement and briefly left the Pine Grove compound. Dr. Neufeld promptly returned, but informed Dr. Kamp of his outing. In response, Dr. Kamp warned Dr. Neufeld that it was the type of behavior that brought him to Pine Grove.

36.     The true motive of Dr. Neufeld's hospitalization became more apparent after his release on August 10, 2017. Dr. Kamp declared Dr. Neufeld fit to practice medicine on the condition he follow several recommendations, almost all of which were objectively invasive, unreasonable, expensive, and medically unnecessary. First, Dr. Kamp recommended Dr. Neufeld enter a two-year monitoring agreement with Southworth, which included Dr. Neufeld being monitored during all work hours. Monitoring is a method of accountability used for individuals with substance abuse or other addictive behavior. Monitoring was recommended despite any proof that Dr. Neufeld had an addictive behavior.

37.     Additionally, Dr. Kamp recommended Dr. Neufeld be retrained on how to properly program the Baclofen pump and obtain permission from Dr. Beattie before caring for Baclofen pump patients. Dr. Kamp is not qualified regarding the use of Baclofen pumps.  A psychiatrist specializing in addiction recovery therapy recommending a highly-trained physiatrist retrain on a pump surgically implanted in the spine is objectively unreasonable.  Dr. Beattie communicated with Dr. Kamp, or others at Pine Grove, about what she wanted the recommendation from Pine Grove to include with regard to Dr. Neufeld.  Dr. Kamp's recommendation that Dr. Neufeld receive additional training on the Baclofen pump, and furthermore, to receive permission from Dr. Beattie, was a product of Pine Grove's collusion with St. Luke's. This fact was confirmed when

Dr. Beattie and St. Luke's informed Dr. Neufeld that all of Dr. Kamp's recommendations would be considered requirements for Dr. Neufeld to return to work.

38.     Other recommendations from Dr. Kamp included that Dr. Neufeld could not give contact information to patients, was required to be on time to work, and establish regular work hours. Again, all recommendations derived exclusively from Dr. Beattie's complaints despite those complaints being discredited. St. Luke's and Dr. Beattie were using both Pine Grove and Southworth to pursue their own recommendations under the guise of medical legitimacy.

39.     Dr. Kamp recommended Dr. Neufeld receive marriage counseling despite lack of relevancy to Dr. Neufeld's skill and professionalism. This was distressing to both Dr. Neufeld and Plaintiff. Defendants' treatment plan was as invasive and unnecessary as possible for the purpose of harassing Dr. Neufeld to the point he would terminate his employment.

40.     Immediately after Dr. Neufeld returned to Boise in August of 2017 following his release from Pine Grove, Dr. Beattie and Southworth made it clear that Dr. Neufeld was required to fulfill all of Pine Grove's recommendations if he wished to continue his employment at St. Luke's. To that end, Southworth itemized each recommendation in an agreement titled the Recovery Enhancement Program ("REP") given to Dr. Neufeld on August 18, 2017.

41.     Upon return to his office on or about August 10, 2017, Dr. Neufeld found that the contents of his office had been packed up without his knowledge and his personal belongings stored in boxes.  He was not allowed access to the boxes to retrieve his belongings.

42.     St. Luke's had not held his current position for him while he was on the mandatory FMLA leave St. Luke's forced upon him and it prevented him from returning to work.

43.     Dr. Neufeld was given a letter by Dr. Beattie on August 23, 2017 informing him that he had been relieved of his duties as Medical Director of Pediatric Physiatry and he would no longer have an office at St. Luke's.  Dr. Neufeld would be required to complete all paperwork in public areas of the hospital. Dr. Beattie informed Dr. Neufeld he had to comply with Pine Grove's

recommendation without the smallest deviation or his employment with St. Luke's would be terminated. Receipt of the REP and Dr. Beattie's letter devasted Dr. Neufeld. He felt increasingly hopeless and trapped.

44.    Following is release from Pine Grove and upon learning that he had been relieved of his duties as Medical Director, Dr. Neufeld hired attorneys from the Boise, Idaho law firm Givens Pursley who attempted to negotiate new employment terms with St. Luke's on his behalf.

45.    St. Luke's hired a new physiatrist to treat Dr. Neufeld's patients on or around August 11, 2017. St. Luke's announced through a letter to Dr. Neufeld's patients dated August 15, 2017, that yet another physiatrist would also be caring for his patients beginning in October 2017. St. Luke's had effectively replaced Dr. Neufeld with two other pediatric physiatrists, while simultaneously forcing him to submit to patently absurd recommendations to force his resignation. All this was done while St. Luke's knew Dr. Neufeld was mentally strained and suffering from depression.

46.    Still, Dr. Neufeld remained resolved to keep his position and submitted to St. Luke's demands. Dr. Neufeld even signed a copy of the REP, despite its intrusive and groundless recommendations.

47.    While waiting for approval to return to work, Dr. Neufeld finally resolved to receive medical treatment of his own choosing.

48.    On September 7, 2017, Dr. Neufeld was evaluated by psychiatrist Dr. Scott P. Hoopes. Dr. Hoopes found it inappropriate that Dr. Neufeld was receiving treatment from Southworth given it exclusively treats addiction, a condition Dr. Neufeld did not have. Dr. Hoopes also expressed there was no basis for workplace monitoring, and it should not be required. Dr. Hoopes itemized these concerns in a letter sent to St. Luke's on September 21, 2017, recommending to St. Luke's that Dr. Neufeld cease all treatment with Southworth.

49.     On September 26, 2017 Dr. Beattie informed Dr. Neufeld that regardless of Dr. Hoopes' involvement, she and Dr. Seppi intended to make it difficult for him to return to work. Dr. Beattie and St. Luke's informed Dr. Neufeld of their true motives: that they never intended to allow Dr. Neufeld to return to work.

50.     On September 29, 2017, as a result of Defendants' actions toward him, Dr. Neufeld impulsively committed suicide at his home. Immediately prior to his death, Dr. Neufeld recorded videos linking his decision to take his life to Defendants' conduct.

## FIRST CAUSE OF ACTION
### (Wrongful Death and St. Luke's Negligence/*Respondeat Superior*)

51.     Plaintiff restates and incorporates by reference all the allegations set forth in the paragraphs above.

52.     St. Luke's, acting through its agents, apparent agents, representatives, servants, or employees, knew Dr. Neufeld was fatigued and under mental strain from being overworked as direct result of St. Luke's defective call coverage system.

53.     St. Luke's, acting through its agents, apparent agents, representatives, servants, or employees,  assumed a duty to treat Dr. Neufeld's fatigue, mental strain, and depression when they compelled Dr. Neufeld to receive treatment at a facility of St. Luke's choosing.

54.     St. Luke's owed Dr. Neufeld a duty to properly select, train, and supervise its acting agents, apparent agents, representatives, servants, or employees so that competent personnel could appropriately respond to the concerns raised by Dr. Neufeld.

55.     St. Luke's owed Dr. Neufeld a duty to formulate, adopt and enforce necessary policies, procedures, and protocols for use by its staff, physicians and administrators providing guidance and instruction with the respect to the appropriate course of assessment and care in the face of the circumstances such as those presented by Dr. Neufeld.

56.     St. Luke's, acting through its agents, apparent agents, representatives, servants, or employees, breached its duty to Dr. Neufeld by requiring him to receive treatment at Southworth

and Pine Grove, institutions that exclusively treat addictive behavior, and colluding and influencing those institutions and their evaluations and recommendations.

57.     Requiring Dr. Neufeld to receive treatment from institutions that treat addictive behavior when Dr. Neufeld did not suffer from addictive behavior was objectively unreasonable.

58.     St. Luke's breached its duty to properly select, train, and supervise its acting agents, apparent agents, representatives, servants, or employees when it allowed untrained individuals to assess Dr. Neufeld's mental health and determine he be treated for addictive behaviors.

59.     St. Luke's breached its duty to formulate, adopt and enforce necessary policies, procedures, and protocols for use by its staff, physicians and administrators when it failed to have the Baclofen pump issue peer reviewed and when it failed to implement a reasonable call schedule.

60.      St. Luke's unreasonable actions subjected Dr. Neufeld to treatment and hospitalizations that he did not need, and, in fact, worsened his preexisting mental conditions. This compulsory, unnecessary, and invasive medical treatment caused Dr. Neufeld to feel hopeless and trapped, leading him to impulsively commit suicide.

61.     The death of Dr. Neufeld has caused Plaintiff to suffer emotionally, mentally, and financially. St. Luke's is liable for these damages.

## SECOND CAUSE OF ACTION
### (Wrongful Death and St. Luke's Intentional Infliction of Emotional Distress)

62.     Plaintiff restates and incorporates by reference all the allegations set forth in the paragraphs above.

63.     St. Luke's, acting through its agents, apparent agents, representatives, servants, or employees, knew the defective call coverage system was causing Dr. Neufeld to be overworked, resulting in Dr. Neufeld suffering from fatigue, mental strain, and depression. Dr. Neufeld warned St. Luke's that the defective call coverage system was below the standard of care, which consequently risked physician performance and patient safety.

64.     St. Luke's resented Dr. Neufeld's concerns, since correcting the call coverage system would be expensive. St. Luke's determined to silence Dr. Neufeld from voicing the problems with the call coverage system.

65.     Consequently, St. Luke's, acting through its agents, apparent agents, representatives, servants, or employees, harassed and retaliated against Dr. Neufeld, exploiting the April 16, 2017 Baclofen pump incident forcing Dr. Neufeld into a hospitalization that was medically unjustified.

66.     St. Luke's, acting through its agents, apparent agents, representatives, servants, or employees, knew the Baclofen pump did not warrant medical leave or medical evaluation. If St. Luke's had believed the Baclofen pump incident to be a genuine concern, they would have had the matter peer reviewed.

67.     Feigning help for Dr. Neufeld, St. Luke's, acting through its agents, apparent agents, representatives, servants, or employees, demanded he receive invasive medical treatment at Southworth and Pine Grove. St. Luke's, acting through its agents, apparent agents, representatives, servants, or employees, knew these institutions provided intensive treatment to individuals with addictive behavior. St. Luke's also knew Dr. Neufeld did not suffer from addictive behavior, a fact all Defendants confirmed.

68.     St. Luke's, acting through its agents, apparent agents, representatives, servants, or employees, forced Dr. Neufeld to be subjected to evaluations and hospitalizations from Southworth and Pine Grove for the sole purpose of harassing Dr. Neufeld in the hopes he would voluntarily terminate the Agreement and just quit.

69.     St. Luke's intentional use of predatory tactics on an employee they knew was mentally strained and depressed was both extreme, outrageous, and reckless. That extreme, outrageous, and reckless conduct was the direct and proximate cause of Dr. Neufeld committing suicide.

**COMPLAINT AND DEMAND FOR JURY TRIAL - 15**

70.     Dr. Neufeld's death as a result of St. Luke's intentional actions has harmed Plaintiff emotionally, mentally, and financially. St. Luke's is liable for those damages.

## THIRD CAUSE OF ACTION
### (Wrongful Death and Dr. Beattie's and Dr. Seppi's Intentional Infliction of Emotional Distress)

71.     Plaintiff restates and incorporates by reference all the allegations set forth in the paragraphs above.

72.     Dr. Beattie and Dr. Seppi were Dr. Neufeld's supervisors and were aware of Dr. Neufeld's mental strain caused by St. Luke's defective call coverage system. Dr. Neufeld initially believed these administrators were his friends and confided in them his concerns about the call coverage system and its negative impact.

73.     Dr. Beattie and Dr. Seppi knew fixing the defective call coverage system would come at a significant expense, and therefore determined to make Dr. Neufeld's employment intolerable so he would cease all complaints about the call coverage system or voluntarily terminate the Agreement.

74.     Dr. Beattie and Dr. Seppi forced Dr. Neufeld to endure compulsory, unnecessary, and invasive medical treatment to force his termination.

75.     Dr. Beattie and Dr. Seppi's tactics were both extreme, outrageous, and reckless. Furthermore, Dr. Neufeld's suicide was a direct and proximate result of their actions.

76.     Dr. Neufeld's death has caused Plaintiff to suffer emotionally, physically, and financially. Dr. Beattie and Dr. Seppi are liable for those damages.

## FOURTH CAUSE OF ACTION
### (Wrongful Death and Southworth's Negligence/*Respondeat Superior*)

77.     Plaintiff restates and incorporates by reference all the allegations set forth in the paragraphs above.

78.     Southworth, acting through its agents, apparent agents, representatives, servants, or employees, had a duty to provide Dr. Neufeld with reasonable care and provide an objective evaluation of Dr. Neufeld's condition.

79.     Southworth, acting through its agents, apparent agents, representatives, servants, or employees, breached that duty when it recommended an extensive and invasive evaluation of Dr. Neufeld without due consideration of Dr. Neufeld's actual condition. Furthermore, Southworth, acting through its agents, apparent agents, representatives, servants, or employees, breached its duty when it recommended extensive and invasive treatment for Dr. Neufeld, including workplace monitoring. All recommendations made by Southworth, acting through its agents, apparent agents, representatives, servants, or employees, to Dr. Neufeld for evaluation and treatment were for addictive behavior. Southworth, acting through its agents, apparent agents, representatives, servants, or employees, knew or should have known through the exercise of due diligence that Dr. Neufeld did not suffer from addictive behavior. Southworth, acting through its agents, apparent agents, representatives, servants, or employees, further breached its duty to Dr. Neufeld when it colluded with and was influenced by St. Luke's desire to force Dr. Neufeld to resign his position at St. Luke's.

80.     The actions of Southworth's agents, apparent agents, representatives, servants, or employees were patently unreasonable, outrageous, and reckless.

81.     Southworth's breach was the direct and proximate cause of Dr. Neufeld suffering severe mental distress which resulted in Dr. Neufeld's death.

82.     Dr. Neufeld's death has caused Plaintiff to suffer emotionally, physically, and financially. Southworth is liable for these damages.

## FIFTH CAUSE OF ACTION
### (Wrongful Death and Pine Grove and Forrest General's Negligence/*Respondeat Superior*)

83.     Plaintiff restates and incorporates by reference all the allegations set forth in the paragraphs above.

84.    Pine Grove is part of Forrest General Hospital, which in turn is operated by Forrest General Health Services, Inc.  At all times, when providing services to Dr. Neufeld, providers at Pine Grove were agents, apparent agents, representatives, servants, or employees of Defendants Pine Grove and/or Forest General Health Services, Inc.

85.    Pine Grove and Forest Health, acting through their agents, apparent agents, representatives, servants, or employees, had a duty to provide Dr. Neufeld with a medical evaluation and care that was objectively reasonable.

86.    Pine Grove and Forest Health, acting through their agents, apparent agents, representatives, servants, or employees, breached that duty when they evaluated and treated Dr. Neufeld according to the recommendations of St. Luke's and Dr. Beattie, disregarding Dr. Neufeld's actual medical conditions of fatigue and depression.  Pine Grove and Forest Health further breached their duty to Dr. Neufeld when, acting through their agents, apparent agents, representatives, servants, or employees, they colluded with and were influenced by St. Luke's desire to force Dr. Neufeld to resign his position at St. Luke's.

87.    Pine Grove and Forest General, acting through their agents, apparent agents, representatives, servants, or employees, knew or should have known through the exercise of due diligence that Dr. Neufeld did not suffer from addictive behavior and did not belong at its facility.

88.    The actions of Pine Grove and Forest General's agents, apparent agents, representatives, servants, or employees were patently unreasonable, outrageous, and reckless.

89.    Pine Grove and Forest General's breach was the direct and proximate cause of Dr. Neufeld suffering severe mental distress resulting in Dr. Neufeld's death.

90.    As a result, Plaintiff has suffered emotionally, physically, and financially. Pine Grove and Forrest General Health Services, Inc. are liable for these damages.

## SIXTH CAUSE OF ACTION
### (Wrongful Death and St. Luke's Violation of the FMLA)

91.     Plaintiff restates and incorporates by reference all the allegations set forth in the paragraphs above.

92.     St. Luke's, acting through its agents, apparent agents, representatives, servants, or employees, required Dr. Neufeld to take a leave of absence to receive medical treatment that they recommended. St. Luke's, acting through its agents, apparent agents, representatives, servants, or employees, claimed Dr. Neufeld's medical treatment was necessary to perform the essential functions of his job.

93.     To ensure St. Luke's would hold his position for him during his leave, Dr. Neufeld applied for a leave of absence pursuant to 29 U.S.C. § 2612, otherwise known as the Family Medical Leave Act. Dr. Neufeld provided practicable notice to St. Luke's of his request for a leave of absence.

94.     Upon on his return from his FMLA leave, Dr. Neufeld was entitled to be restored to his previous position and title at St. Luke's.

95.     Instead, St. Luke's, acting through its agents, apparent agents, representatives, servants, or employees, interfered with Dr. Neufeld's FMLA protections by refusing to restore Dr. Neufeld to his previously held positions unless he completed extensive, invasive, and unnecessary demands. St. Luke's interference is a direct violation of 29 U.S.C. § 2615(a)(1).

96.     St. Luke's refusal to restore Dr. Neufeld to his previously held positions at St. Luke's was in retaliation of Dr. Neufeld invoking his rights under the FMLA. St. Luke's retaliatory conduct was in direct violation of 29 U.S.C. § 2615(a)(2).

97.     St. Luke's interference and retaliatory actions against Dr. Neufeld invoking a leave of absence protected by the FMLA was a direct violation of Dr. Neufeld's rights under federal law. That violation caused Dr. Neufeld to feel extreme devastation at the loss of his hard-earned positions at St. Luke's, including Medical Director of Pediatric Physiatry. This devastation was the direct and proximate cause of Dr. Neufeld impulsively committing suicide.

98.     St. Luke's violation of the FMLA caused the death of Dr. Neufeld, which was the direct and proximate cause of Plaintiff suffering physically, emotionally, and financially. St. Luke's is liable for these damages.

**SEVENTH CAUSE OF ACTION**
**(Defendants' Negligent and Intentional Infliction of Emotional Distress Upon Plaintiff)**

99.     Plaintiff restates and incorporates by reference all the allegations set forth in the paragraphs above.

100.    Defendants knew Plaintiff was married to Dr. Neufeld throughout relevant time period of this matter as explained above.

101.    Defendants owed Plaintiff a duty to not cause Plaintiff emotional distress in the treatment of her husband, Dr. Neufeld.

102.    Defendants breached their duty to Plaintiff when they required Dr. Neufeld to undergo medically unnecessary and invasive treatment for the sole purpose of harassment and retaliation. Defendants actions included removing Dr. Neufeld from his marital residence for nearly two months and requiring Plaintiff and Dr. Neufeld to undergo marriage therapy without any medical bases or discussion with Plaintiff. The absence of her husband and demands for marital therapy caused Plaintiff emotional distress.

103.    Defendants actions were the direct and proximate cause of Dr. Neufeld's death, resulting in Plaintiff suffering emotional distress.

104.    The treatment of Dr. Neufeld and his subsequent death have caused and will continue to cause Plaintiff severe emotional distress. As result of that distress, Plaintiff now suffers from anxiety, depression, sleeplessness, and change in appetite. Defendants are liable for these damages.

**REQUEST FOR ATTORNEY FEES**

Plaintiff has been required to retain counsel to pursue this matter.  Plaintiff has retained the law firm of POWERS FARLEY, PC, and has agreed to pay said attorneys a reasonable fee.

**COMPLAINT AND DEMAND FOR JURY TRIAL - 20**

Plaintiff is entitled to recover her reasonable costs and attorney fees incurred in the prosecution of this matter pursuant to Rule 54 of the Idaho Rules of Civil Procedure, Idaho Code §12-120(1) and Idaho Code §12-121 or other applicable law.

## PUNITIVE DAMAGES

Plaintiff reserves the right to amend this complaint to include a cause of action for punitive damages, pursuant to Idaho Code § 6-1604.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury as to all issues so triable pursuant to Rule 38(b) of the Idaho Rules of Civil Procedure and will not stipulate to a jury of less than 12 jurors.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

1.      For the recovery of all special and general damages sustained as a direct and proximate result of Defendants' misconduct, all in a precise amount to be proven at the time and place of trial of this action, but which in any event exceed the jurisdictional limits of $10,000;

2.      For costs and reasonable attorney fees incurred in the prosecution of this action.

3.      For such other and further relief as the Court deems just and equitable.

DATED this ___1st___ day of April, 2019.

POWERS FARLEY, PC

By _____
        Raymond D. Powers - Of the Firm
        Portia L. Rauer - Of the Firm
        Attorneys for Plaintiff